**2013-1496**

# United States Court of Appeals
# for the Federal Circuit

GOLDEN BRIDGE TECHNOLOGY, INC.,

*Plaintiff-Appellant,*

*v.*

APPLE INC.,

*Defendant-Appellee,*

*and*

MOTOROLA MOBILITY, LLC,

*Defendant.*

*Appeal from the United States District Court for the District of Delaware in Case No. 10-CV-0428, Judge Sue L. Robinson.*

## NON-CONFIDENTIAL BRIEF OF DEFENDANT-APPELLEE APPLE INC.

TIMOTHY S. TETER
BENJAMIN G. DAMSTEDT
LORI R. MASON
LOWELL D. MEAD
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
(650) 843-5000

*Attorneys for Defendant-Appellee Apple Inc.*

November 14, 2013

# CERTIFICATE OF INTEREST

Counsel for Defendant-Appellee Apple Inc. certifies the following:

1.      The full name of every party or amicus represented by me is:

      Apple Inc.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

      Apple Inc.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

      None.

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

      COOLEY LLP:  Stephen C. Neal, Timothy S. Teter, Benjamin G. Damstedt, Lori R. Mason, Lowell D. Mead, Eamonn Gardner.

      POTTER ANDERSON & CORROON, LLP:  Richard L. Horwitz, David Ellis Moore.


Dated: November 14, 2013            /s/ Timothy S. Teter

                                *Counsel for Defendant-Appellee Apple Inc.*

i

# TABLE OF CONTENTS

*Page*

STATEMENT OF RELATED CASES ...................................................................1

I.  STATEMENT OF THE ISSUES ................................................................2

II.  STATEMENT OF THE CASE ...................................................................2

III.  STATEMENT OF FACTS .........................................................................6

    A.  This Case Is GBT's Second Attempt To Claim Credit for the UMTS RACH Method. ........................................................................6

        1.  The 3GPP rejected GBT's proposed RACH procedure. ............6

        2.  GBT attempted to re-purpose its collision-detection patent application to cover a RACH ramp-up process. .............8

    B.  The Patents-in-Suit ........................................................................10

        1.  The patents describe and claim preambles that are spread before transmission and transmitted at constant power levels. ........................................................................................10

        2.  During prosecution, GBT confirmed that the claimed "preambles" are spread before transmission and sent at constant power levels. ..................................................................11

    C.  The Accused PRACH Preamble Is Neither Spread Before Transmission Nor Transmitted at Constant Power. ...........................12

    D.  The District Court Granted Summary Judgment and Denied GBT's Repeated Reconsideration Requests........................................13

        1.  During summary judgment, GBT accused only the PRACH Preamble and relied entirely on its claim construction arguments. ..........................................................13

2.    The district court rejected GBT's reconsideration motions, which raised a new theory that read the "preamble" on the signature sequence. ......................................15

IV.    SUMMARY OF THE ARGUMENT ...........................................................17

V.    ARGUMENT................................................................................................18

A.    Standard of Review. ........................................................................18

B.    The District Court Correctly Held that All Asserted Claims Require Spreading the Preamble Before Transmission. .....................19

1.    GBT repeatedly stipulated that the claimed "preamble" is "spread before transmission" and included that stipulation in the '267 and '427 file histories. ..........................19

a.    The stipulated definition became part of the intrinsic record. ...............................................................19

b.    This Court should reject GBT's efforts to erase its stipulated construction from the intrinsic record...........21

2.    The specification confirms the stipulated construction. ...........24

3.    The original prosecution history is also consistent with the "preamble" being spread before transmission. ...................26

4.    None of GBT's other arguments justifies disregarding the stipulated construction. ............................................................28

C.    The District Court Correctly Granted Summary Judgment of Non-Infringement and Denied Reconsideration. .................................30

1.    At summary judgment, GBT did not dispute any facts but instead raised another claim construction dispute, which the district court properly rejected. ...........................................30

2.    GBT's jumbled and internally inconsistent new theory, even if considered, does not raise an issue of fact for trial.......32

a.    GBT waived its new theory. ...........................................32

b.    Even if the Court considers GBT's new theory, it should find that the district court did not abuse its discretion in rejecting the theory. ....................34

(1)    The standard of review is abuse of discretion, not de novo. ...........................34

(2)    GBT's new theory is fundamentally inconsistent with the theory it presented through summary judgment. .................36

(3)    The district court correctly held that Dr. Vojcic's conclusory statement does not create an issue for trial under Apple's construction. ..........................................39

(4)    GBT's new theory fails to create an issue for trial because the scrambling code is indisputably required for communication with the base station. ............................43

D.    The Court Should Also Affirm on the Alternative Grounds that the Accused Products Do Not Transmit Preambles at "Discrete Power Levels." ...................................................................46

1.    The district court correctly construed "discrete power level" to mean "constant distinct power level.".......................47

a.    GBT previously agreed that "discrete power level" requires a "constant" power level...................................47

b.    The intrinsic record supports the district court's construction....................................................................48

(1)    The ordinary meaning supports the district court's construction. ............................48

(2)    The specification teaches preambles transmitted at "constant" power levels.................48

(3)    The prosecution histories confirm that each "entire" preamble must be transmitted "completely at" a single power "level," without ramping. .................................................50

c.    The district court correctly rejected GBT's claim construction arguments.................................................53

2.    Under the correct construction of "discrete power level," summary judgment of non-infringement is required. ...............55

a.    GBT must prove that the accused products meet the literal claim language exactly, because it waived any equivalents theory. .......................................55

b.    GBT presented no evidence that the accused products transmit preambles at constant power levels. ..............................................................................56

(1)    The 3GPP standard specifies varying, non-constant power levels. ..........................................56

(2)    GBT's argument that ramping up and down is necessary does not raise a material disputed fact. ........................................................59

(3)    "Comprising" does not abrogate the "discrete power level" limitation. ........................61

VI.    CONCLUSION.............................................................................65

## CONFIDENTIAL MATERIAL OMITTED

The material redacted from this brief is subject to a protective order.  The information redacted on page 58 relates to a document that has been designated as confidential pursuant to the protective order and contains third-party confidential information including trade secret technical information that is not publicly available.

v

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abtox v. Exitron*,
122 F.3d 1019 (Fed. Cir. 1997) ........................................................64

*Applied Med. v. U.S. Surgical*,
448 F.3d 1324 (Fed. Cir. 2006) ..................................................40, 41

*Arthur A. Collins v. N. Telecom*,
216 F.3d 1042 (Fed. Cir. 2000) ........................................................40

*Bailey v. Dart Container*,
292 F.3d 1360 (Fed. Cir. 2002) ........................................................46

*Becton, Dickinson and Co. v. Tyco Healthcare Group*,
616 F.3d 1249 (Fed. Cir. 2010) ........................................................55

*Bhatnagar v. Surrendra Overseas*,
52 F.3d 1220 (3d Cir. 1995) ............................................................36

*Blystone v. Horn*,
664 F.3d 397 (3d Cir. 2010) ..............................................19, 34, 35

*Clock Spring v. Wrapmaster*,
560 F.3d 1317 (Fed. Cir. 2009) ........................................................33

*CVI/Beta Ventures v. Tura Lp*,
112 F.3d 1146 (Fed. Cir. 1997) ........................................................22

*Delaware Valley Floral v. Shaw Rose Nets*,
597 F.3d 1374 (Fed. Cir. 2010) ..........................................18, 19, 33

*Dippin' Dots v. Mosey*,
476 F.3d 1337 (Fed. Cir. 2007) ........................................................63

*Dynacore Holdings v. U.S. Philips*,
363 F.3d 1263 (Fed. Cir. 2004) ..................................................40, 57

*Ekchian v. Home Depot,*
    104 F.3d 1299 (Fed. Cir. 1997) ....................................................22

*Ethicon Endo-Surgery v. US Surgical,*
    93 F.3d 1572 (Fed. Cir. 1996) ...............................................46, 64

*Exigent Tech. v. Atrana Solutions,*
    442 F.3d 1301 (Fed. Cir. 2006) .......................................18, 46, 64

*Ferring B.V. v. Barr Labs.,*
    437 F.3d 1181 (Fed. Cir. 2006) ....................................................33

*Free Motion Fitness Inc. v. Cybex International, Inc.,*
    423 F.3d 1343(Fed. Cir. 2005) ...............................................62, 63

*Fresenius USA v. Baxter Int'l,*
    582 F.3d 1288 (Fed. Cir. 2009) ....................................................33

*Golden Bridge Tech. v. Motorola,*
    547 F.3d 266 (5th Cir. 2008) .........................................................8

*Golden Bridge Tech. v. Nokia,*
    527 F.3d 1318 (Fed. Cir. 2008) ...........................................8, 9, 34

*Golight v. Wal-Mart Stores,*
    355 F.3d 1327 (Fed. Cir. 2004) ....................................................28

*Hakim v. Cannon Avent Group,*
    479 F.3d 1313 (Fed. Cir. 2007) ....................................................23

*Hockerson-Halberstadt v. Avia Group,*
    222 F.3d 951 (Fed. Cir. 2000) .........................................24, 28, 53

*Howard Hess Dental v. Dentsply,*
    602 F.3d 237 (3d Cir. 2011) ...................................................19, 34

*iLOR, LLC v. Google, Inc.,*
    550 F.3d 1067 (Fed. Cir. 2008) ....................................................26

*Insituform v. Cat Contracting,*
    99 F.3d 1098 (Fed. Cir. 1996) .....................................................64

*Intellectual Science v. Sony*,
   589 F.3d 1179 (Fed. Cir. 2009) ........................................................40

*Intervet America v. Kee-Vet Laboratories*,
   887 F. 2d 1050 (Fed. Cir. 1989) .......................................................28

*KCJ v. Kinetic Concepts*,
   223 F.3d 1351 (Fed. Cir. 2000) ........................................................64

*Kraft Foods v. Int'l Trading*,
   203 F.3d 1362 (Fed. Cir. 2000) ........................................................54

*Kustom Signals v. Applied Concepts*,
   264 F.3d 1326 (Fed. Cir. 2001) ........................................................63

*Lemelson v. General Mills*,
   968 F.2d 1202 (Fed. Cir. 1992) ........................................................24

*Novartis v. Ben Venue Labs.*,
   271 F.3d 1043 (Fed. Cir. 2001) ........................................................40

*Rheox, Inc. v. Entact, Inc.*,
   276 F.3d 1319 (Fed. Cir. 2002) ........................................................49

*Senza–Gel Corp. v. Seiffhart*,
   803 F.2d 661 (Fed. Cir. 1986) .........................................................35

*Sitrick v. DreamWorks*,
   516 F.3d 993 (Fed. Cir. 2008) .........................................................40

*Southwall Techs. v. Cardinal IG*,
   54 F.3d 1570 (Fed. Cir. 1995) .........................................................61

*Springs Window Fashions v. Novo Indus.*,
   323 F.3d 989 (Fed. Cir. 2003) .........................................................23

*Telemac Cellular v. Topp Telecom*,
   247 F.3d 1316 (Fed. Cir. 2001) ........................................................55

*Uship Intellectual Props v. United States*,
   714 F.3d 1311 (Fed. Cir. 2013) ........................................................22

## OTHER AUTHORITIES

37 C.F.R. § 1.56(b) ............................................................................22

37 C.F.R. § 1.97(h) ...........................................................................22

Fed. R. Evid. 703 ..............................................................................59

Fed. R. Civ. P. 56 .............................................................................59

**STATEMENT OF RELATED CASES**

Defendant-Appellee Apple Inc. ("Apple") agrees that the cases identified by Plaintiff-Appellant Golden Bridge Technology, Inc. ("GBT") are related to the present case.  (BB[1] at xii-xiv.)  In particular, in *Golden Bridge I*, GBT agreed that the term "preamble" means "a signal used for communication with the base station that is spread before transmission," telling this Court that GBT "does not take issue with the definition of 'preamble.'"  (A3255-56.)

---

[1]     "BB" refers to GBT's opening, blue brief.

## I.    STATEMENT OF THE ISSUES

1.    Did the district court correctly construe "preamble" to mean "a signal for communicating with the base station that is spread before transmission," where the intrinsic record, including GBT's prior statements and stipulation, required that construction?

2.    Did the district court correctly grant summary judgment of non-infringement where the undisputed evidence established that the accused devices do not spread the accused preambles before transmission?

3.    Did the district court act within its discretion in denying GBT's multiple motions for reconsideration and in holding that GBT failed to present or support its new "signature sequence" infringement theory?

4.    Alternatively, should the judgment of non-infringement be affirmed because, as GBT's experts admitted, the accused devices do not transmit preambles at constant power levels and thus do not meet the "discrete power levels" limitation?

## II.    STATEMENT OF THE CASE

This case relates to a process by which mobile radios, such as cell phones, gain access to a "random access" channel in a cellular system.  To make contact

with the base station, mobile radios in the patented system "spread"[2] known

signals called "preambles" and send them to the base station.  If the base station

detects the preamble, it responds with an acknowledgment to the mobile radio,

which sends its message to the base station.  If the mobile radio does not receive an

acknowledgement, it assumes that the base station did not hear the preamble

transmission and sends another preamble at a new, higher power level.

GBT accused Apple's mobile devices that use a third generation (3G)

cellular technology referred to as UMTS or WCDMA.[3]  GBT also accused devices

made by numerous other defendants in related cases, including Amazon, Dell,

Lenovo, Motorola Mobility, Sony Ericsson, Pantech, LG, HTC, and Hewlett-

Packard/Palm entities (the "joint defendants").  The district court allowed the joint

defendants to participate in consolidated claim construction briefing while their

cases remained otherwise stayed.  (A2749-87.)

GBT asserted a standards-based infringement theory, contending that the

asserted claims are essential to practice the **p**hysical **r**andom **a**ccess **ch**annel or

"PRACH" portions of the UMTS/WCDMA standard.  GBT alleged the UMTS

---

[2]    Spreading increases the bandwidth of the data signal by multiplying the
relatively low-frequency data signal by a spreading signal with a much higher chip
rate.  Spreading allows multiple users to share a single frequency channel.

[3]    "UMTS" stands for "Universal Mobile Telecommunications System."
"WCDMA" stands for "Wideband Code Division Multiple Access."

process for sending "PRACH preambles" necessarily infringes the asserted claims. GBT relied primarily on the standard; it did not rely on any source code or RTL code.

As GBT itself conceded to the PTO, to a Texas district court in *Golden Bridge I*, and to this Court in the *Golden Bridge I* appeal, GBT's patents require the claimed preamble to be "spread before transmission." (A3249-64 at A3255-56; A3224-41 at A3228-30; A3242-48 at A3245.) GBT incorporated that stipulation into the reexamination file history for U.S. Patent No. 6,574,267 and the file history for U.S. Patent No. 7,359,427. (A1674-80 at A1680; A2007-10 at A2010; A2635-42 at A2639, A2641; A2677-79 at A2679.)

Apple and the joint defendants relied on GBT's definition, arguing that GBT should be held to its statements to the PTO. (A2749-69.) The parties recognized that GBT's standards-based case hinged on claim construction, filing cross-motions for summary judgment on infringement in anticipation of the district court's claim construction decision. (A2818; A2821.) The district court agreed with Apple and the joint defendants, finding that GBT's stipulated construction of "preamble" and "access preamble" still governed.

On summary judgment, Apple showed that GBT did not invent the accused UMTS RACH procedure but instead described and claimed a fundamentally

4

different technique. In contrast to GBT's patents, the 3GPP[4] group elected to spread the data but not to spread the PRACH preambles, which are sent in the clear, *i.e.*, without spreading, to UMTS base stations. Thus, UMTS is fundamentally different from the patents-in-suit, which require spreading both the data *and* the preambles. Accordingly, applying that construction to the undisputed facts, the court correctly granted summary judgment of non-infringement. (A41-42.)

As an alternative ground for summary judgment, Apple demonstrated below that its accused products do not transmit preambles at "discrete power levels," as all asserted claims require. For years, GBT had also stated to the PTO, to the district court in *Golden Bridge I*, and even in the case below that "discrete power levels" were "constant, distinct power levels." (A1167-68; A3211 (GBT Texas *Markman* brief); A1680 (submitting *Markman* brief in '267 reexam); A2587-89 at A2589 (same in '427 prosecution); A2722-24 at A2724 (present case).) Apple and the joint defendants relied on the intrinsic record in construing the "discrete power levels" limitation, and the district court interpreted the claims accordingly. (A24.) The 3GPP standard specifies that the preambles include significant periods of power ramping (both increasing and decreasing powers) as well as substantial

---

[4]    "3GPP" stands for the "3rd Generation Partnership Project."

periods of power overlap with other preambles.  Thus, the accused devices send

preambles at neither "constant" nor "distinct" power levels, providing an alternate

basis for affirming the non-infringement judgment.

## III.    STATEMENT OF FACTS

### A.    This Case Is GBT's Second Attempt To Claim Credit for the UMTS RACH Method.

#### 1.    The 3GPP rejected GBT's proposed RACH procedure.

GBT is a non-practicing entity that has been attempting to claim credit for

the 3GPP UMTS standard for years.  The aspect of the standard at issue here, the

RACH ramp-up procedure, is not GBT's invention.

In the 1998-1999 timeframe, Ericsson, GBT, and others made fundamentally

different, competing proposals to the standards setting groups.  Ericsson proposed

a RACH procedure in which the mobile station would send a preamble at a

constant power level, wait for an acknowledgment, and then send the next

preamble at an increased, constant power level if it received no acknowledgment

during the wait period.  (A3530-34.)  Before submitting its idea to the group,

Ericsson filed for a patent on its RACH procedure, which ultimately issued as U.S.

Patent No. 6,606,313.  (A3474-81.)

GBT proposed a different procedure in which the mobile station quickly

ramps up power within a single preamble whose "length should be such that the

probability of capture by the base station is maximized."  (A3535-41 at A3537,

A3540.)  GBT did not file a patent application for its proposal.  Ericsson disagreed with GBT's proposal, arguing that "[t]he GBT proposal introduces a significant danger due to faulty power control," because "the mobile will continue to rapidly ramp up and may seriously disrupt UL [uplink] traffic" if it mistakenly fails to receive an acknowledgment.  (A3542-53 at A3549.)

The standards-setting organizations rejected GBT's concept and eventually pursued a variation of Ericsson's proposal, with a significant difference—in the UMTS standard, the power ramps up and down for a portion of the time within each separate preamble.  (A835-36.)  GBT's co-founder admitted that "the understanding within GBT" was that Ericsson first proposed the RACH acquisition procedure:  "[T]he random access channel ... was owned by Ericsson ... RACH was not our invention, bottom line, and it was not considered so until [GBT CEO] Elmer decided to perhaps push[] things."  (A3524 (75:9-22); A3526 (81:10-83:17); A3527 (92:16-21).)  Instead, GBT filed a patent application suggesting specific collision-detection procedures as *improvements* to Ericsson's original constant-level method, not the partial-ramping RACH method eventually adopted by 3GPP.  GBT's original claims, title, abstract, and summary of the invention focus on "Collision Detection," not the preamble power-ramping at issue here.  (A936-981.)

Although GBT failed to get the 3GPP to adopt its RACH procedure, GBT initially persuaded the 3GPP group to include a different, non-RACH technology

7

as an option in the UMTS standard.  GBT called this technology the "common packet channel" or "CPCH."  However, no party ultimately implemented GBT's ideas, and the 3GPP group eliminated them from the standard.  In 2005, GBT filed an antitrust suit against many 3GPP members, alleging that they conspired "to remove GBT technology from the new standards" and "rendered GBT's technology virtually valueless."  (A3208-09.)  The courts dismissed GBT's antitrust claims on summary judgment.  *Golden Bridge Tech. v. Motorola*, 547 F.3d 266 (5th Cir. 2008).

> ### 2.    GBT attempted to re-purpose its collision-detection patent application to cover a RACH ramp-up process.

While GBT pursued its CPCH idea and antitrust litigation, it also recast its "collision detection" improvement to Ericsson's constant-power RACH proposal, alleging that GBT, not Ericsson, came up with the constant-power RACH idea. GBT accordingly amended the specification, abstract, title, and claims.  (A1057-60; A1067-72; A3194-3206.)  Despite these significant amendments, GBT did not cite Ericsson's RACH proposal or its '313 patent (filed nearly six months before GBT's collision-detection application) (A115-16) during the original '267 prosecution.  The PTO issued the '267 patent to GBT, which asserted it against Lucent and Nokia in the Eastern District of Texas, alleging that it covered the UMTS RACH process.  *Golden Bridge Tech. v. Nokia*, 527 F.3d 1318 (Fed. Cir. 2008).

Notwithstanding GBT's amendments, the '267 patent did not cover the unspread, partially ramping PRACH preamble used in the UMTS RACH process. During the Texas *Markman* proceedings, GBT agreed that "preamble," as used in the '267 patent, means "a signal used for communicating with the base station that is spread before transmission," and that transmitting a preamble at a "discrete power level" means transmitting at a "constant power level."  (A3228-30; A3245; A3211.)

The Texas court issued a claim construction order (A3224-41), but did not reach non-infringement, because it granted summary judgment of anticipation. (A1714-1726; A1986-90.)  On appeal, this Court affirmed, noting that GBT "completely abandoned ... [its] arguments made below" and attempted to raise new arguments "for the first time on appeal."  *Golden Bridge I*, 527 F.3d at 1322 n.3, 1324.

While that appeal was pending, GBT sought new claims during (1) a reexamination of the '267 patent and (2) a continuation of the '267 application, which ultimately issued as the '427 patent-in-suit.  GBT submitted the Texas court *Markman* order and pleadings in both the '267 reexamination and the '427 file history, setting forth GBT's agreed definitions of "preamble" and "discrete power level."  (A1680; A1810; A2010; A2639; A2641; A2679; A2589.)  GBT never

retracted either of the definitions or otherwise suggested that they would not apply to the new claims.

### B.    The Patents-in-Suit.

#### 1.    The patents describe and claim preambles that are spread before transmission and transmitted at constant power levels.

GBT's patents describe and claim a method for a mobile radio, such as a cell phone, to access a base station using a spread-spectrum CDMA system.  (A115, A137, A145.)  The mobile radio ("remote station") generates a known signal called a "preamble," spreads the preamble using a spreading sequence, and transmits the preamble to the base station at a constant power level.  (A130-31 col. 5:18-23, 5:28-35, 5:61-6:2, 7:47-51; A120 (Fig. 4 "preamble generator" and "spreading sequence generator"); A122 (constant-power preambles).)  If the remote station does not receive an acknowledgement from the base station, the remote station increases the power to a new constant level, and transmits another preamble at that higher power level: "[P]ower is increased in time from preamble to preamble in a step-wise manner.  *The transmitted power during each preamble is constant*."  (A131 col. 7:47-51 (emphasis added); A130-31 col. 6:27-32, 7:58-61.)  Once the remote station receives an acknowledgement, it stops transmitting preambles and transmits message information.  (A131 col. 7:58-61.)

10

**2.    During prosecution, GBT confirmed that the claimed "preambles" are spread before transmission and sent at constant power levels.**

During prosecution, GBT distinguished its claimed invention from a prior art Interdigital patent to Ozluturk (A3454-73).[5]  GBT acknowledged that Ozluturk "discloses a power ramp-up technique for use in the access phase of a wireless communication, implemented in a CDMA network," where "the mobile station continuously repeats transmissions of an access code, at continuously increasing power levels (Fig. 5), until it receives an acknowledgement from the base station." (A1166.)

GBT distinguished its invention from Ozluturk on two significant grounds. First, in contrast to Ozluturk, which did not spread its access code before transmission, GBT argued that its "access preamble" is "spread in essentially the same manner as other data."  (A1167.)

Second, Ozluturk did not transmit each preamble at a constant power "level," but rather, increased the power while transmitting the preamble.  In contrast, GBT explained that its claimed invention transmits "preambles, *each of which is completely at one of the different levels*."  (A1168 (emphasis added).)

---

[5]    GBT's opening brief argues that GBT invented power-ramping preambles and sending preambles separate from message data.  As GBT acknowledged during the original '267 prosecution, however, Ozluturk disclosed those features. (A1166; A3454-73.)

11

GBT explained that where its claims recite a first power "level" and a second power "level," the claims require "a *complete* transmission of a preamble *at* either 'level,' *as claimed*." (*Id.* (emphasis added).) "Stated another way, the *entire* first preamble transmission is *at* a one 'first power level,' and the *entire* second preamble transmission is *at* a one 'second power level.'" (*Id.* (emphasis added).)

## C.    The Accused PRACH Preamble Is Neither Spread Before Transmission Nor Transmitted at Constant Power.

The UMTS standard specifies that a mobile device should send an access signal—called the "PRACH preamble"—to a specific base station in an effort to gain access to the random access channel. The UMTS Standard specifies that the PRACH preamble is made from the combination of (1) a base station specific scrambling code and (2) a signature. (A822.) The PRACH preamble in UMTS systems is the "access signal" that the mobile uses for communicating with the base station of interest. (A631-34 (¶¶146-49); A822 (§ 4.3.3).) Although the UMTS standard specifies that data and control signals should be spread, the standard provides that the PRACH preamble is *not* spread. (A631-34 (¶¶146-49); A636 (¶157); A641 (¶167); A816 (§ 4.2.2); A42.) To the contrary, the UMTS standard specifies that the mobile devices transmit the PRACH preamble in the clear. (*Id.*)

The UMTS standard also specifies that the power ramps up and down *within the preamble itself.* (A835-36.) In contrast to GBT's claimed invention, mobile

12

devices operating according to the UMTS standard do *not* transmit preambles at

*constant* power levels.

**D.    The District Court Granted Summary Judgment and Denied GBT's Repeated Reconsideration Requests.**

In May 2010, GBT filed a lawsuit in California against Apple and AT&T on

the '267 and '427 patents.  (A3482-84.)  After receiving a judge assignment, GBT

voluntarily dismissed its complaint (A3485-86) and re-filed in Delaware, adding

Motorola.  GBT dismissed the claims against AT&T without prejudice, and stayed

the claims against Motorola.  (A3506-07; A3493-3505.)  After discovery on

liability, the Court held claim construction and summary judgment proceedings,

granting summary judgment of non-infringement.

**1.    During summary judgment, GBT accused only the PRACH Preamble and relied entirely on its claim construction arguments.**

At the summary judgment and claim construction hearing, GBT rested its

infringement case on its claim construction arguments.  GBT continued to read the

"preamble" limitation on the PRACH preamble, and argued that "it does not

matter" that the preamble itself is not spread.  (A3081 (125:16-23); A3107

(151:6-9).)

In its order following the hearing, the district court first construed the

"preamble"/"access preamble" terms as "a signal for communicating with the base

station that is spread before transmission and that is without message data."  (A19.)

13

The district court held that GBT was not estopped from rearguing the construction of "preamble," but noted that "there is nothing new in the additional new prosecution history" that alters the "spread before transmission" limitation: "The court finds that the construction of 'access preamble' and the stipulated construction of 'preamble' from the Texas litigation are still applicable insofar as they include spreading prior to transmission." (A11-12.)

In the wake of the claim construction, the district court granted summary judgment of non-infringement, because "**the preamble itself** must be spread prior to transmission." (A41-42 (bold in original).) GBT had alleged only that spreading occurred during the process of *creating* the PRACH preamble. (A42.) GBT did not argue or provide evidence that the PRACH preamble itself is spread as claimed.[6] Apple and its non-infringement expert Dr. Kakaes dispute whether the signature is in fact "spread" at all in generating the PRACH preamble, but as the district court recognized, that dispute is beside the point. As the district court observed, spreading that allegedly occurs during the *generation* of the PRACH

---

[6]    In its summary judgment reply/opposition brief, GBT first hinted at a new infringement theory. In one sentence of attorney argument, GBT suggested that it could have read the preamble claim limitation on the signature (one of the building blocks of the accused PRACH preamble). (A3409.) However, as Apple responded, GBT's "brief cite[d] no evidence supporting this claim, and [GBT's expert] Dr. Vojcic said no such thing." (A3447.) GBT also cited an irrelevant deposition answer that the signature is a "digital signal," which the district court correctly dismissed (A62) and GBT does not cite.

14

preamble is irrelevant.  (A42.)  The claims require the access signal *itself* to be

spread, and the "signature is not, by itself, an access signal or preamble."  (A42,

A2870-71 (citing Kakaes ¶¶114-176 (A617-646)).)

### 2. The district court rejected GBT's reconsideration motions, which raised a new theory that read the "preamble" on the signature sequence.

GBT then moved for reconsideration, accusing the district court of failing to

"apply its own construction."  (A2894.)  GBT attempted to argue a new

infringement theory that would read the "preamble" limitations on the "signature

sequence."  (A2895-96.)  GBT's new theory was internally inconsistent: it would

accuse one signal (signature) as being the preamble for some elements, and a

*different* alleged "signal" (PRACH preamble) as being the preamble for other

elements in the *same claim*.

Contrary to GBT's brief, the district court did *not* grant GBT's motion for

reconsideration.  Rather, as the court clarified, the court agreed "to review the

merits of the motion," yet did not "grant the relief sought."  (A59 n.1.)  Moreover,

the court expressly "declin[ed] to review on reconsideration evidence (e.g.,

deposition testimony) that was not included in the summary judgment record."

(A63 n.8.)  After extended argument (A3111-26), the district court denied GBT's

motion for reconsideration and affirmed summary judgment of non-infringement.

(A59-64.)

15

The district court rejected GBT's attempt to "shoe-horn its infringement theory into the court's claim construction" (A62) with "new attorney argument" and a new infringement theory. (A64.) As the court explained:

> Having had both its proposed claim construction and its evidence of infringement rejected, GBT attempts to identify a genuine issue of material fact sufficient to justify trial, arguing on reconsideration that the signature sequence is an access signal without message data that is spread before transmission, thus meeting the court's claim construction....
>
> *The undisputed evidence contained in the record presented during the summary judgment exercise demonstrates that the accused devices require the combination of the signature sequence and the scrambling code in order to communicate with a base station.... A signal for communicating with the base station does not exist in the accused devices until the access preamble is generated - the signature is multiplied to form the signature sequence which is then spread by the base station's scrambling code.* Therefore, the signal for communicating with the base station is not spread prior to transmission. Despite GBT's new attorney argument, the record evidence remains consistent with the finding of non-infringement under the operating claim construction for this case.

(A62-64 (emphasis added).)

GBT then filed a *second* reconsideration motion, seeking reconsideration of the order denying reconsideration. (A2920.) The district court denied it, finding that GBT "rehashes the arguments it made during oral argument on April 11, 2013 and supplemental briefing." (A66.) This appeal followed.

16

## IV.    SUMMARY OF THE ARGUMENT

The district court correctly construed "preamble" to mean "a signal for communicating with the base station that is spread before transmission." GBT's repeated statements to the PTO, to the Texas court, and to this Court—which GBT submitted without protest or reservation in the '267 reexamination and '427 file histories—leave no doubt.

The district court also correctly granted summary judgment of non-infringement. The operation of the accused products is not in dispute—the parties agree that the PRACH preamble itself is *not* spread before transmission. The parties dispute only (1) whether GBT could raise a new, self-contradictory infringement theory on reconsideration, and (2) whether GBT presented evidence requiring a trial on infringement under the new theory. The district court found for Apple on both points, accurately describing GBT's new, post-summary judgment theory as "new attorney argument" unsupported by expert opinions or other record evidence. (A64.)

The judgment of non-infringement should be affirmed on alternative grounds as well. The undisputed evidence showed that the accused devices do *not* transmit preambles at constant power levels, and as a result, do not meet the "discrete power levels" limitation. The district court did not rely on this alternative ground in granting summary judgment. Instead, after properly construing the

17

"discrete power levels" limitation, the court agreed with GBT that because the claims use the word "comprising," the claims cover preambles sent at *non-constant* and *non-distinct* powers, so long as the power is constant for at least *part* of the preamble.

"Comprising" is not a weasel word, and does not expand the claims. To prove literal infringement—the only theory GBT asserted—GBT must present evidence that the accused devices send the *entire* preamble (not only *part* of the preamble) at a constant, distinct power level. As set forth below, GBT's experts concede that the accused PRACH preambles are *not* sent at a constant, distinct power level. Thus, this issue presents a pure question of law—whether the word "comprising" abrogates the "discrete power levels" limitation and vitiates the arguments that GBT made during prosecution. This Court should hold that it does not. Summary judgment of non-infringement was appropriate.

## V.    ARGUMENT

### A.    Standard of Review.

This Court reviews summary judgment de novo. *Delaware Valley Floral v. Shaw Rose Nets*, 597 F.3d 1374, 1378 (Fed. Cir. 2010). This Court affirms summary judgment of non-infringement where "there is an absence of evidence to support the [patentee]'s case." *Exigent Tech. v. Atrana Solutions,* 442 F.3d 1301, 1307-10 (Fed. Cir. 2006)).

18

The Court reviews a denial of reconsideration "under the law of the pertinent regional circuit." *Delaware Valley Floral*, 597 F.3d at 1379 (separately reviewing grant of summary judgment and denial of reconsideration). The Third Circuit reviews denial of reconsideration for abuse of discretion. *Howard Hess Dental v. Dentsply*, 602 F.3d 237, 246-252 (3d Cir. 2011); *Blystone v. Horn*, 664 F.3d 397, 415-16 (3d Cir. 2010) ("The scope of a motion for reconsideration, we have held, is extremely limited.").

### B. The District Court Correctly Held that All Asserted Claims Require Spreading the Preamble Before Transmission.

#### 1. GBT repeatedly stipulated that the claimed "preamble" is "spread before transmission" and included that stipulation in the '267 and '427 file histories.

##### a. The stipulated definition became part of the intrinsic record.

The patents-in-suit have taken a long road to this appeal. Before this case, GBT informed this Court, a Texas district court, and the PTO that the claimed "preamble" in the '267 patent was "spread before transmission." In *Golden Bridge I*, GBT told this Court: "The parties stipulated that a preamble is construed as a 'signal used for communication with the base station that is *spread before transmission*.' ... Golden Bridge Technology does not take issue with the definition of 'preamble,' which was stipulated by the parties below." (A3255-56 (emphasis added); *see also* A2127.)

GBT also made that stipulated definition part of the intrinsic record used to construe the claims.  GBT submitted the agreed definition of "preamble" as reflected in its appeal brief (A3255-56) and the Texas court's *Markman* order (A3228-30) and summary judgment order (A3245) in both the '267 reexamination and the '427 prosecution.  ('267 reexamination:  A1674-80 at A1674 ("It is respectfully requested that the documents be expressly considered ...."), A1680 (Texas *Markman* order), A1808-10 at A1810 (Texas summary judgment order), A2007-10, A2008 (submitting GBT's Appeal Brief "for consideration"), A2127; '427 prosecution: A2635-42 at A2639, A2641; A2677-79 at A2679.)  The second '267 patent reexamination request also highlights GBT's agreed construction of "preamble."  (A3207.)

GBT did not attempt to retract or qualify its express definition of "preamble" at any time during the '267 or '427 prosecutions.  On the contrary, GBT told the Examiner to "expressly consider" GBT's definition, and the Examiner did just that.  (A1680, A1810, A2010, A2639, A2679 (Examiner initials).)  In contrast, when GBT disagreed with something from the *Golden Bridge I* record, GBT said so expressly.  (A1809 (objecting to findings on other issues); A2637 (same).)

Thus, GBT repeatedly put the public on notice—including numerous defendants GBT later sued, such as Apple, Amazon, Dell, Lenovo, Motorola,

20

Sony, LG, HTC, and HP—that the claimed "preambles" of the '267 reexamined

patent and the '427 continuation patent were "spread before transmission."

> **b.      This Court should reject GBT's efforts to erase its stipulated construction from the intrinsic record.**

GBT now attempts to rewrite history and remove its stipulated definitions

from the record.  GBT first argues that the construction of "preamble"/"access

preamble" was "not presented to or passed upon by this Court."  (BB at xii, n.1.)

But the construction of those terms was presented to this Court, and GBT *agreed*

*with it*, stating that it "*does not take issue with the definition of 'preamble.'*"

(A3255-56 (emphasis added).)

Next, GBT incorrectly suggests that its *Golden Bridge I* admissions are

relevant only in considering whether collateral estoppel applies.  (BB38-41.)  GBT

fails to recognize that even if collateral estoppel does not strictly prohibit GBT

from rearguing the definition of "preamble," its *Golden Bridge I* definitions appear

multiple times in the '267 reexamination and in the '427 file histories.  Thus,

regardless of whether collateral estoppel applies, GBT submitted the stipulated

"preamble" definition in the file histories for the public to rely upon.

Third, GBT argued that submitting materials with an Information Disclosure

Statement ("IDS"), "without more," is meaningless.  (A3296.)  But here, GBT did

not merely provide a third-party reference—GBT submitted its own express

definition of the claim term, consistent with the specification and the original '267

21

prosecution, and "requested that [it] be expressly considered."  GBT has cited no case in which this Court did not hold a patentee to an express, stipulated definition simply because the patentee provided that definition in an IDS rather than some other part of the intrinsic record.  To the contrary, this Court has held the patentee to the statements it includes in an IDS:

> An IDS is part of the prosecution history on which the examiner, the courts, and the public are entitled to rely.... It is reasonable to infer, absent an indication to the contrary, that an examiner will consider an IDS when determining whether to allow the claims; the courts and the public may rely on it as well.

*Ekchian v. Home Depot*, 104 F.3d 1299, 1303-04 (Fed. Cir. 1997).  Likewise, "an applicant's remarks submitted with an [IDS] can be the basis for limiting claim scope."[7]  *Uship Intellectual Props v. United States*, 714 F.3d 1311, 1315 (Fed. Cir. 2013).  Having told the Examiner to consider its definition of "preamble" without qualification, GBT "cannot now turn its back on the meaning ... which it embraced ... during the prosecution of the ... patent and during the reexamination proceeding."  *CVI/Beta Ventures v. Tura Lp*, 112 F.3d 1146, 1159 (Fed. Cir. 1997).

---

[7]    In the district court, GBT ignored *Ekchian*, arguing that an IDS is not an "admission" that the information is "material to patentability as defined in § 1.56(b)."  37 C.F.R. §§ 1.97(h), 1.56(b).  Those sections merely establish that an applicant can submit prior art references without conceding those references are material pursuant to section 1.56.

Fourth, GBT argues it did not embrace the definition it submitted—even though GBT stipulated to it in *Golden Bridge I*—but rather, remained silent about it.  However, if GBT wished to dispute or rescind the stipulated definition, it had to do so clearly during the '267 reexamination and the '427 prosecution:

> Although a disclaimer made during prosecution can be rescinded, permitting recapture of the disclaimed scope, the prosecution history must be sufficiently clear to inform the examiner that the previous disclaimer, and the prior art that it was made to avoid, may need to be re-visited.

*Hakim v. Cannon Avent Group*, 479 F.3d 1313, 1317-18 (Fed. Cir. 2007); *Springs Window Fashions v. Novo Indus.*, 323 F.3d 989, 995 (Fed. Cir. 2003) (the applicant "never retracted any of his statements" and "therefore must be held to the restrictive claim construction that was argued during prosecution").

Finally, GBT argues it should get a do-over, because the new claims are different from those at issue in *Golden Bridge I*.  Nothing in the patents, claim language, or prosecution history, however, suggests that "preamble" meant a signal "spread before transmission" in the prior litigation and prosecutions, and means something else here.  In fact, some currently asserted claims are *identical* to those asserted in Texas, except for irrelevant dependent claim limitations.  (A3224 ('267 claims 27, 29 in Texas); A143 (dependent claims 51, 52 currently asserted).)  Likewise, just as here, GBT asserted claims in Texas that do not expressly recite a step of "spreading" the preamble, but even then, GBT agreed that *every*

23

"preamble" must be "spread before transmission." (A3224; A3228; A3255-56

('267 claims 23-26); A134-36.) Contrary to GBT's argument, the law does not

give GBT the right to a "mulligan":

> [The patentee's argument] reduces to a request for a mulligan
> that would erase from the prosecution history the inventor's
> disavowal of a particular aspect of a claim term's meaning.
> Such an argument is inimical to the public notice function
> provided by the prosecution history.

*Hockerson-Halberstadt v. Avia Group*, 222 F.3d 951, 955 (Fed. Cir. 2000).

In sum, this Court should reject GBT's attempt to "shift [its] stance" after

prosecution "to argue for a second bite at the abandoned apple." *Lemelson v.*

*General Mills*, 968 F.2d 1202, 1207-08 (Fed. Cir. 1992). Apple and "[o]ther

players in the marketplace are entitled to rely on the record made in the Patent

Office in determining the meaning and scope of the patent." *Id*. The definition in

the file histories controls.

## 2.    The specification confirms the stipulated construction.

As the district court observed, the specification supports GBT's previously

stipulated construction. (A12.) For example, Figure 4, annotated below, shows

structures that generate, spread, and transmit the preamble. The "preamble

generator" 452 (lower right side) generates the preamble. The preamble passes

through a packet formatter (424) and gain adjuster (425), as does other data and

signaling. The product device (426) spreads the preamble with a spreading

24

sequence input from a spreading sequence generator (427). Finally, the preamble

passes through a digital-to-analog converter (428), modulates the carrier (429 &

430), and is transmitted. The patent does not describe any alternative path for the

preamble—in every case, the mobile spreads the preamble before transmitting it.



FIG. 4

(A120 (red line and highlighting added).)

GBT responds by noting that the specification suggests "many ways of

*generating* preamble waveforms." (BB30-31 (citing A131, 8:19-20, 7:19-22)

(emphasis added).) GBT misses the point. As the district court recognized, the

specification contemplates various ways of initially *generating* a preamble

waveform, but "does not contemplate any other embodiment regarding generating

and transmitting a preamble." (A12.) The specification explains that the mobile device spreads the preamble before transmission, just like all other data. (A1167; A120.) The specification does not contemplate any preamble that is not spread before transmission. Although that fact by itself is not dispositive, it provides further evidence that the claimed "preambles" are spread before transmission. *E.g.*, *iLOR, LLC v. Google, Inc.*, 550 F.3d 1067, 1074 (Fed. Cir. 2008) (using fact that "specification did not disclose any embodiment in which the user must further act to display the toolbar" in construing claims).

### 3. The original prosecution history is also consistent with the "preamble" being spread before transmission.

The district court also cited the original '267 prosecution history (upstream from the '267 reexaminations and the '427 patent where GBT provided its stipulated construction), in which GBT discussed that the "preamble" is spread before transmission, in contrast with Ozluturk:

> Another disclosed distinction is that *the access preamble here* is itself a form of code data (e.g. a signature) that *is spread in essentially the same manner as other data*. For example, *Fig. 4 shows spreading of the preamble* (see also p. 9, lines 12-20) .... By comparison, Ozluturk teaches simply transmitting spreading codes without any data carried on the short code or access code transmissions. Transmission of a spreading code only is not a transmission of a spread access preamble.

(A1167-68 (emphasis added).)

26

On appeal, GBT contends that this passage was limited to only a few claims and that the amendments to claims 47 and 49 would have been "meaningless" under the district court's interpretation.  (BB32-36.)  GBT's statement in the original prosecution history, however, is perfectly consistent with and cannot trump the definition it later provided in the '267 reexamination and '427 continuation patent.  In the original prosecution, GBT cited the sole preamble embodiment from Figure 4 and stated: "Another disclosed distinction is that the access preamble here is itself a form of code data (e.g. a signature) that is spread in essentially the same manner as other data."  (A1167-68.)  Likewise, during the later prosecutions, GBT submitted its definition of "preamble" and "access preamble" as being "spread before transmission."[8]

Moreover, in amending its claims during the original prosecution GBT stated that the amendments were intended only "to more clearly point out" a distinction over the prior art.  (A1169.)  As the district court stated: "[T]he fact that spreading was added 'to more clearly point out' a distinction over the prior art indicates that, even prior to amendment, the patentee contemplated a preamble to

---

[8]    *E.g.*, A1674-80 at A1680; A2007-10 at A2010; A2635-42 at A2639, A2641; A2677-79 at A2679.

27

be spread prior to transmission."[9]  (A15.)  Accordingly, nothing in the original

'267 prosecution history justifies disregarding GBT's stipulated definition from the

later prosecutions.  On the contrary, the original '267 prosecution supports GBT's

stipulated definition, as the district court observed.

### 4.    None of GBT's other arguments justifies disregarding the stipulated construction.

GBT raises a handful of additional arguments in an effort to overturn the

district court and recant the previously stipulated construction.  First, GBT

erroneously suggests that its previously stipulated definition somehow excludes the

preferred embodiment.  (BB59-60.)  GBT's argument is incorrect.  The "preamble"

is generated at block 452.  At block 426, the preamble is spread prior to

transmission.  Nothing in the district court's construction would exclude the

spreading at block 426.

GBT next argues that requiring the "preamble" to be spread before

transmission "introduces a second level of spreading into the claims which recite a

'spreading' limitation, or it renders the 'spreading' limitation in those claims

---

[9]     *Golight* is inapposite because the applicant specified that its arguments
"were made to distinguish *only* those claims that *explicitly* recited" the limitation.
*Golight  v. Wal-Mart Stores*, 355 F.3d 1327, 1333 (Fed. Cir. 2004) (emphasis
added).  *Intervet* is also inapposite, because it addresses only the rare situation
where the prosecutor misstates the claim language.  *Intervet America v. Kee-Vet
Laboratories*, 887 F. 2d 1050, 1054 (Fed. Cir. 1989).  Here, the prosecutor did no
such thing.  *Hockerson-Halberstadt,* 222 F.3d at 956-57 (distinguishing *Intervet*).

superfluous." (BB28-29, 36-38.)  The district court considered and correctly rejected this argument: "The patentee simply chose to draft certain claims to recite the 'object' (a preamble that is spread before transmission) and the step of 'transmitting' it, without explicitly reciting the 'spreading' step.  That choice, however, does not change the meaning of 'preamble.'"  (A13-14.)

In other words, the patentee used several different claim structures to try to give flexibility in pursuing handset maker or component (chip) makers without raising divided infringement issues.  Some claims require the step of "spreading" or "transmitting" to be performed by a single entity, while other claims do *not* require the "spreading" step to be performed by the same entity that performs all of the other steps.  Thus, some claims can be practiced even if a *different* chip (provided by a different entity) performs the "spreading" step.  In every case, however, the claimed "preamble" is spread prior to transmission, as GBT previously acknowledged.  By analogy to an agricultural invention, claims could cover (1) growing a crop, and/or (2) harvesting that crop—but even if the claim recites only the harvesting step, the crop must still grow first.

Finally, GBT asserts that "Apple has argued ... that the preambles in the Accused Devices, which are undisputedly devices used in spread spectrum communications, are not spread before transmission." (BB38.)  Claims must be construed without reference to the accused device, but in any event, GBT's

argument is a *non-sequitur*. The district court did not conclude, and Apple did not argue, that *every* signal in *every* "spread spectrum" system is *necessarily* spread. The court did not adopt the previously stipulated claim construction merely because the claims refer to "spread spectrum" systems and methods.

Accordingly, as GBT previously stipulated, represented to this Court, and indicated in the file histories, the claimed preamble must be spread before transmission.

### C. The District Court Correctly Granted Summary Judgment of Non-Infringement and Denied Reconsideration.

### 1. At summary judgment, GBT did not dispute any facts but instead raised another claim construction dispute, which the district court properly rejected.

In anticipation of the claim construction ruling, GBT moved for summary judgment of infringement, and Apple cross-moved for summary judgment of non-infringement. (A2818, A2821, A2823.) In its summary judgment briefing, GBT did not raise any disputed facts about the PRACH preamble. Instead, GBT offered a new twist on its claim construction argument. GBT contended that if the district court interpreted the claims to require spreading, it should hold that the claims covered spreading that allegedly takes place when the PRACH preamble is *generated*. (A3407-09.) The district court correctly rejected GBT's arguments, holding that "**the preamble itself** must be spread prior to transmission." (A41 (bold in original).)

30

On appeal, GBT reiterates its new "generation" claim construction argument, though it gives the argument short-shrift.  (BB62-65.)  GBT's argument conflicts with the claims, specification, and prosecution history.  As the district court observed, the claimed "preamble" cannot be spread before it exists—"the preamble itself" must be spread.  (A41.)  The specification likewise describes (1) generating the preamble and, subsequently, (2) spreading the preamble in the same manner as other data.  (A130, col. 5:18-35; A120 (compare FIG. 4 block 452, generating the preamble, with block 428, spreading the preamble).)  Finally, GBT confirmed during prosecution that the relevant "spreading" is performed "in the same manner as other data" as Figure 4 shows—in other words, the preamble is spread after it is generated.  (A1167 ("Fig. 4 shows spreading of the preamble (see also p. 9, lines 12-20)"); A945 (application 9:12-20 describes "preamble generator" and "spreading-sequence generator").)[10]

GBT further alleges that Apple's expert, Dr. Kakaes, agreed with GBT's construction.  (BB63-64.)  To the contrary, he explained: "How the access preamble was constructed in the first place, the claim leaves a lot of room for....

*However the access preamble is constructed, though, the claim requires that it be*

---

[10]    GBT raises another *non-sequitur*, noting that a "Gold code" can be used during construction of the "preamble."  (BB64 (citing A131 col. 8:20-39).)  But the specification does not refer to that construction operation as "spreading" a preamble.  (A131 col. 8:20-39.)

*spread.*"  (A789 (141:11-24); *see also id.* at 139:7-13 ("So just to make sure we're clear, that preamble is what later gets spread.").)

In opposing summary judgment and on appeal, GBT identified no material disputed facts and relied solely on an erroneous claim construction.  Accordingly, the non-infringement judgment should be affirmed.

### 2.    GBT's jumbled and internally inconsistent new theory, even if considered, does not raise an issue of fact for trial.

#### a.    GBT waived its new theory.

On appeal, GBT argues a theory it failed to present and support at summary judgment.  In particular, after the court granted summary judgment of non-infringement, GBT moved for reconsideration with a new theory, reading the "preamble" limitation on the signature sequence, not the PRACH preamble.

Apple defended this case and developed its *Markman* and summary judgment positions based on the infringement theory GBT presented—which read the "preamble" limitation on the PRACH preamble, not the signature.[11]  Neither the district court nor Apple consented to GBT's belated new infringement theory.

---

[11]    GBT now cites a single line in Dr. Kakaes' 183-page expert report, claiming that Dr. Kakaes "acknowledged" GBT's new theory.  (BB52, 55.)  To the contrary, Dr. Kakaes addressed GBT's theory that the PRACH preamble (not the signature sequence) is the claimed "preamble," and explained that the accused PRACH preamble is *not* spread before transmission.  (A631-39.)  He did not agree that GBT had raised an alternative theory—rather, he noted that Dr. Vojcic's theories were internally flawed and inconsistent, and rebutted Dr. Vojcic's argument that the PRACH preamble is spread during its generation.  (A638-39.)

When GBT hinted at a new "signature sequence" theory in its summary judgment reply/opposition (A3409), Apple objected that "GBT attempts to change its infringement theory," noting that GBT's "brief cites no evidence supporting this claim, and [GBT's expert] Dr. Vojcic said no such thing." (A3447.)

The consequences for failing to present and support an argument in opposition to summary judgment are well-established. *Clock Spring v. Wrapmaster*, 560 F.3d 1317, 1328-29 (Fed. Cir. 2009) (patentee "waived" an argument not made "[i]n its opposition to [defendant]'s motion for summary judgment"); *Delaware Valley Floral Group, Inc. v. Shaw Rose Nets, LLC*, 597 F.3d 1374, 1380 n.1 (Fed. Cir. 2010) (refusing to consider declarations not submitted at summary judgment: "This evidence could not have been considered by the district court at that time .... [I]t would be improper to consider this evidence when determining whether summary judgment was appropriate.").

Likewise, a conclusory, unsupported attorney argument does not preserve any basis for appeal. *Fresenius USA v. Baxter Int'l*, 582 F.3d 1288, 1295-96 (Fed. Cir. 2009) ("If a party ... presents only a skeletal or undeveloped argument to the trial court, we may deem that argument waived on appeal, and we do so here."); *Ferring B.V. v. Barr Labs.*, 437 F.3d 1181, 1193 (Fed. Cir. 2006) ("Conclusory allegations and attorney arguments are insufficient to overcome a motion for

33

summary judgment.... There must be sufficient substance, other than attorney argument, to show that the issue requires trial.").

In fact, this Court has previously warned GBT directly that it cannot simply abandon arguments and present new ones after an adverse judgment. *Golden Bridge I*, 527 F.3d at 1322 n.3, 1324 (affirming summary judgment of invalidity where GBT, which switched counsel on appeal, "completely abandoned ... [its] arguments made below" and declining to consider GBT's new arguments "raised for the first time on appeal").

Accordingly, the Court should find that GBT waived the signature-sequence argument and cannot challenge the non-infringement judgment under that theory.

> **b.    Even if the Court considers GBT's new theory, it should find that the district court did not abuse its discretion in rejecting the theory.**
>
> **(1)    The standard of review is abuse of discretion, not de novo.**

Even if the Court allows GBT to pursue its new theory, the Court should apply the abuse-of-discretion standard of review, not de novo review. *Howard Hess Dental*, 602 F.3d at 246-52; *Blystone*, 664 F.3d at 415-16. After summary judgment, GBT moved for reconsideration on its untimely "signature sequence" infringement theory. (A2894.) The court correctly denied GBT's reconsideration motion, rejecting GBT's attempt to "shoe-horn its infringement theory into the

court's claim construction" (A62) with a "new attorney argument" advocating a new infringement theory.  (A64.)

In an effort to circumvent the appropriate standard of review, GBT asserts that the standard of review for the court's denial of its reconsideration motion is de novo because the court "granted" its motion for reconsideration.  (BB42 n.14.) The district court, however, clarified that it did *not* "grant the relief sought" by GBT on reconsideration:  "Although the court 'granted' the motion for reconsideration, it explained that it only meant to review the merits of the motion, not that it meant to grant the relief sought."  (A59 (citation omitted).)

Thus, the arguments and theories that GBT presented for the first time in its reconsideration motions are not part of the summary judgment record and are not subject to de novo review.  Instead, to advance the new "signature sequence" theory on appeal, GBT must show that the district court abused its discretion in rejecting GBT's new theory.  "The scope of a motion for reconsideration, we have held, is extremely limited.  *Such motions are not to be used as an opportunity to relitigate the case.*"  *Blystone*, 664 F.3d at 415-16 (emphasis added); *see also Senza–Gel Corp. v. Seiffhart*, 803 F.2d 661, 663-64, 668 (Fed. Cir. 1986) ("[A] motion for reconsideration is not a chance for a second bite, and ... a grant of such

a motion not based on newly found, previously unknown facts, would enable the movant to 'sandbag' an adversary.").

As detailed below, the court did not abuse its discretion in rejecting GBT's "classic attempt at a 'second bite at the apple.'" *Bhatnagar v. Surrendra Overseas*, 52 F.3d 1220, 1231 (3d Cir. 1995). Rather, "[h]aving failed in its first effort to persuade the court ... , [plaintiff] simply changed theories and tried again, contradicting its earlier evidence with its factual support for the new theory." *Id*.

> **(2)    GBT's new theory is fundamentally inconsistent with the theory it presented through summary judgment.**

The district court recognized that GBT's new theory—that the signature is the claimed preamble—is fundamentally inconsistent with the infringement theory GBT presented through summary judgment. Numerous asserted claims require the "preamble" to be selected from among a plurality of preambles "assigned" or "allocated" to the base station. (A236-37 ('267 claim 50); A244 ('267 claim 51); A246 ('267 claim 52); A248 ('267 claim 58); A251-52 ('267 claims 59-60); A267 ('427 claim 16); A271 ('427 claim 20).) The signature, however, is *not* assigned to the base station; only the PRACH preamble, constructed using the base station-specific scrambling code, can be assigned to the base station.

For that reason, at summary judgment, GBT and Dr. Vojcic argued that the

PRACH preamble met the "assigned to the base station" limitations "*because the*

*primary scrambling code is assigned to the respective base station*."  (A240-41,

¶107 (emphasis added); A242-43, ¶111.)  Accordingly, the experts from both sides

agreed that the accused PRACH preamble was the access signal transmitted by the

mobile devices:

- "The UE initiates a RA procedure by *transmitting a PRACH preamble* at an initial power level."  (A213 (Vojcic ¶48) (emphasis added));

- "If the UE does not receive any response ... , the UE proceeds with *transmitting the PRACH preambles*."  (A216 (Vojcic ¶50) (emphasis added));

- "Once the nodeB has detected one of the *transmitted PRACH preambles*, it transmits an acknowledgment ...."  (A216 (Vojcic ¶51) (emphasis added));

- "[A] mobile station *sends access attempts, in the form of PRACH preambles*, to the base station."  (A462 (Boncelet ¶9) (emphasis added));

- "[T]he mobile station *transmits a PRACH preamble* to the base station."  (A475 (Boncelet ¶47) (emphasis added)); and

- "[T]he preamble signature and the scrambling code are merely 'building blocks' for constructing the access signal, which is then used to construct the signal that is ultimately sent (i.e., the PRACH preamble access code)."  (A634 (Kakaes ¶149)).

In other words, before summary judgment, GBT and Dr. Vojcic chose *not* to

read the preamble limitation on the signature sequence itself.  Instead, GBT

accused only the PRACH preamble, "formed by *combining* one of the available preamble signatures *with the preamble scrambling code specific to the base station*." (A240-41, ¶107 (emphasis added).)  As the district court observed:  "The undisputed evidence contained in the record presented during the summary judgment exercise demonstrates that *the accused devices require the combination of the signature sequence and the scrambling code in order to communicate with a base station*." (A63 (emphasis added).)

On reconsideration and again on appeal, GBT abandons its original infringement theory and relies on new attorney arguments, contending that the scrambling code is *not* required to communicate with the base station after all. (A56-59.)  But no evidence supports GBT's erroneous argument.  To the contrary, GBT's own expert rejected it:  "[T]he CPICH provides the primary *scrambling code* to the Accused Devices, which is *required to be used to communicate with the base station*." (A238, ¶101 (emphasis added).)  Thus, Vojcic argued that the scrambling code was one of the "parameters *required for transmission to the base station*." (A238, ¶101 (quoting '267 claim 50) (emphasis added).)

**(3)    The district court correctly held that Dr. Vojcic's conclusory statement does not create an issue for trial under Apple's construction.**

In addition to contradicting its previous theory, GBT's new theory is based on yet more new attorney arguments and irrelevant materials that do not raise a material factual dispute.  For example, GBT's expert expressly addressed Apple's proposed construction only in paragraph 74 of his report/declaration: "In view of the foregoing, the access preambles of the Accused Devices necessarily also literally meet Apple's proposed construction of this term, *i.e.,* a signal used for communicating with the base station that is spread before transmission."  (A226.) GBT also points to Dr. Vojcic's catch-all comments that "regardless of which construction is accepted by the Court, the limitation is met," and "[t]he Accused Devices therefore literally read on limitation [iii] under either proposed construction."  (BB50-52.)

The district court correctly held that Dr. Vojcic's conclusory statements did not create an issue for trial:

> The opinion as it relates to Apple's construction is conclusory, and does not specifically address GBT's current contention that the signature sequence alone constitutes a signal for communicating with the base station.  Indeed, such a conclusion seems inconsistent with the correct explanation contained in the same opinion that "each access preamble is composed of two spreading codes."

(A63 n.7.)

"Conclusory expert assertions cannot raise triable issues of material fact on summary judgment." *Sitrick v. DreamWorks*, 516 F.3d 993, 1001 (Fed. Cir. 2008). Instead:

> To satisfy the summary judgment standard, a patentee's expert must set forth the factual foundation for his infringement opinion *in sufficient detail for the court to be certain* that features of the accused product would support a finding of infringement under the claim construction adopted by the court, with all reasonable inferences drawn in favor of the non-movant.

*Intellectual Science v. Sony*, 589 F.3d 1179, 1183-84 (Fed. Cir. 2009) (emphasis added) (citation omitted); *Arthur A. Collins v. N. Telecom*, 216 F.3d 1042, 1047-48 (Fed. Cir. 2000) ("When, as here, the construction of a critical claim limitation is in dispute, a party may not avoid summary judgment simply by offering an opinion of an expert that states, in effect, that the critical claim limitation is found in the accused device."); *Novartis v. Ben Venue Labs.*, 271 F.3d 1043, 1051-52 (Fed. Cir. 2001) (applying *Collins* in case arising in Third Circuit).[12]

In support of its attempt to rely on Dr. Vojcic's passing remark, GBT cites only *Applied Medical v. U.S. Surgical*, 448 F.3d 1324, 1335 (Fed. Cir. 2006),

---

[12]    *See also Dynacore Holdings v. U.S. Philips*, 363 F.3d 1263, 1278 (Fed. Cir. 2004) ("It is well settled that an expert's unsupported conclusion on the ultimate issue of infringement is insufficient to raise a genuine issue of material fact, and … a party may not avoid that rule simply by framing the expert's conclusion as an assertion that a particular critical claim limitation is found in the accused device.").

which bears no resemblance to the instant case.  The *Applied Medical* expert

declaration, unlike Dr. Vojcic's report, provided a detailed "explanation as to why

one of skill in the art would view both structures as supporting the valve portions

in substantially the same way to achieve substantially the same result," discussing

the supporting factual evidence.  *Id*.  Here, far from providing a substantially

supported opinion that the signature sequence is the preamble, Dr. Vojcic argued

the opposite so that he could allege infringement of the "assigned to the base

station" claims.

On appeal, GBT declares that "Vojcic opined that the signature sequence

literally meets the 'signal for communicating with the base station' aspect of the

District Court's construction."  (BB50-51 (quoting ¶74).)  However, GBT's new

interpretation of paragraph 74 contradicts its previous view.  During the summary

judgment briefing, GBT argued that paragraph 74 showed that "spreading the

access preamble *during construction* literally infringes the claims."  (A3408, citing

Vojcic ¶¶74-75 (emphasis added)).

In an effort to recharacterize paragraph 74, GBT omits the sentence that the

district court highlighted, which shows that GBT accused the PRACH preamble—

not the signature itself—of being the claimed access preamble:  "As indicated

above, in the Accused Devices, *each access preamble is composed of two*

*spreading codes* without message data." (A226 (emphasis added).)[13]  In the

passages "indicated above," Dr. Vojcic stated:  *The PRACH preamble is*

*composed of two spreading codes* without message data." (A213, ¶48 (emphasis

added).)[14]  In other words, as the district court noted, Dr. Vojcic identified the

PRACH preamble—not the signature—as being the alleged "access preamble."

        In an effort to rewrite the record, GBT argues that when Dr. Vojcic

mentioned the "preamble," he meant the "the preamble after it is spread, i.e. the

'spread access preamble.'" (BB54-55.)  The district court did not abuse its

discretion in rejecting GBT's revisionist interpretation.  In paragraphs 48, 74, and

elsewhere, Dr. Vojcic reiterated that the accused "access preamble"—not the

"spread" access preamble, but the accused preamble itself—is the *combination* of

the signature with the base-station-specific scrambling code.  He had no other

choice, because GBT asserted claims that required the "preamble" to be selected

from preambles "assigned" or "allocated" to the base station.  (A236-37 ('267

---

[13]      Paragraph 74 then explains how that "access preamble" is composed of (1) a
"PRACH signature code," combined with (2) the "PRACH scrambling code"—
that is, the accused "access preamble" is the PRACH preamble.  (A225-26.)  Dr.
Vojcic also opined in that paragraph, for example, how multiple "access preambles
simultaneously transmitted by two or more users ... may use the same PRACH
scrambling code"—each accused "access preamble" is the signal that is
"transmitted" after it is constructed using a PRACH scrambling code.  (*Id.*)

[14]      GBT's block quote omits this key sentence.  (BB48-9 (¶48).)

claim 50); A244 ('267 claim 51); A246 ('267 claim 52); A248 ('267 claim 58);

A251-52 ('267 claims 59-60); A267 ('427 claim 16); A271 ('427 claim 20).)

The signatures are indisputably *not* signals assigned to the base stations in

the accused systems (all signatures are available to all base stations), so GBT and

Dr. Vojcic argued only that the "preamble" was the PRACH preamble, which is

the *combination* of the signature and the base-station-specific scrambling code.

For example, Dr. Vojcic stated:

> Thus, as explained above, each access preamble is formed by
> combining one of the available preamble signatures with the
> preamble scrambling code specific to the base station.  The
> combination of an available preamble signature and scrambling
> code specific to the base station results in an access preamble.

(A241, ¶107.)

> **(4)    GBT's new theory fails to create an issue for
> trial because the scrambling code is
> indisputably required for communication with
> the base station.**

GBT's new theory—that the signature is the claimed preamble—fails to

create an issue of fact under the district court's construction for another reason.  As

noted above, the district court observed:  "The undisputed evidence contained in

the record presented during the summary judgment exercise demonstrates that *the*

*accused devices require the combination of the signature sequence and the*

*scrambling code in order to communicate with a base station*."  (A63 (citing

record) (emphasis added).)  GBT's own expert, Dr. Vojcic, conceded as much:

"[T]the CPICH provides the primary *scrambling code* to the Accused Devices, which is *required to be used to communicate with the base station*." (A238, ¶101 (emphasis added).) Thus, Dr. Vojcic argued that the scrambling code was one of the "parameters *required for transmission to the base station*." (A238, ¶101 quoting '267 claim 50 (emphasis added).)

In an effort to brush aside Dr. Vojcic's admissions, GBT raises four arguments. First, GBT attempts to broaden the claim construction. GBT argues that under the district court's construction, anything used "to facilitate" communications could be considered a preamble. (BB55-56.) GBT is mistaken. GBT proposed, and the district court correctly rejected, GBT's proposed construction that included "facilitating." (A61-62 ("In contrast to its prior position in Texas, GBT changed its construction in this litigation, to wit: 'An access signal without message data and comprising one or more codes that distinguish one access preamble/preamble from another and used during an access procedure to facilitate establishing a communication link between a base station and a remote station.'").) GBT does not challenge the district court's correct ruling that the claimed "preamble" is, among other things, the signal used for communicating with the base station. (BB28 n.8.) The signature sequence is not such a signal. As GBT's expert admitted, the scrambling code is "required to be used to communicate with the base station." (A238, ¶101.)

44

Second, GBT accuses the district court of "misapplying its own claim construction" to "require[] the signal to include additional processing performed by the Accused Devices." (BB57-58.) GBT argues that because the claims use "comprising," any additional steps performed by the Accused Products are irrelevant. (BB57.) The argument is a red herring. The use of "comprising" does not excuse GBT's failure to prove an element of the claims. The claims require the "preamble" to be a signal for communicating with the base station that is spread before transmission. Neither the PRACH preamble nor the signature sequence is such a signal.

Third, GBT argues that "the scrambling code does not perform the communicating function" and that "the [base station] de-spreads the preamble in order to recognize and process the underlying signature sequence communication." (BB58-59.) Again, GBT's own expert rejected GBT's argument: "the primary *scrambling code ... is required to be used to communicate with the base station*." (A238, ¶101(emphasis added).)[15]

Fourth, unable to cite any evidence of infringement, GBT cites irrelevant out-of-context snippets from Apple's *invalidity* expert, Dr. Acampora. (BB58-59.)

---

[15]    GBT argues that the prosecution history supports its new theory, but GBT misses the point. (BB64.) The specification explains that the preamble waveform can take many different forms. (A131 col. 8:15-20.) In every case, the preamble "is spread in essentially the same manner as other data." (A1167.)

Dr. Acampora's validity report did not address the accused UMTS process, did not state that the claimed "preamble" did not need to be spread before transmission, and did not state that the UMTS signature corresponds to the claimed preamble. The experts who did address the accused UMTS process all agreed that only the accused PRACH preamble was the access signal actually transmitted by the mobile devices, as set forth above.

Thus, even if this Court considers GBT's new infringement theory, it should affirm summary judgment.

### D.    The Court Should Also Affirm on the Alternative Grounds that the Accused Products Do Not Transmit Preambles at "Discrete Power Levels."

The Court should also affirm the non-infringement judgment on alternative grounds: the Accused Products indisputably do not transmit preambles at "discrete power levels" under the correct claim construction.  *Exigent*, 442 F.3d at 1307-10. "Appellees always have the right to assert alternative grounds for affirming the judgment that are supported by the record."  *Ethicon Endo-Surgery v. US Surgical*, 93 F.3d 1572, 1582 (Fed. Cir. 1996) (affirming judgment of non-infringement on alternative grounds).[16]

---

[16]    *Bailey v. Dart Container*, 292 F.3d 1360, 1362 (Fed. Cir. 2002) ("[A]n appellee can present in this court all arguments supported by the record and advanced in the trial court in support of the judgment as an appellee, even if those particular arguments were rejected or ignored by the trial court.").

1.    **The district court correctly construed "discrete power level" to mean "constant distinct power level."**

All asserted claims recite that the remote station transmits each preamble at a "discrete power level" or transmits multiple preambles at "discrete power levels." (A141-44 ('267 claims 42-44, 50-52, 58-60); A165-67 ('427 claims 9, 10, 14-22, 24, 26-28).)  At the district court, the parties disputed whether the term "discrete power level" required transmitting the preamble at a constant power (Apple's position) or whether the term allowed the power to be ramped up or down during transmission of the preamble (GBT's position).  The district court correctly construed "discrete power level" to mean "a constant distinct power level." (A19-24.)

a.    **GBT previously agreed that "discrete power level" requires a "constant" power level.**

As with the "preamble" term discussed above, Apple and the joint defendants relied on GBT's repeated statements that the term "discrete power level" referred to "a constant distinct power level."  As the district court observed, "[i]t is noteworthy that GBT also initially agreed in the instant Civ. No. 10-428 case, as well as in the Texas litigation, that a 'discrete power level' is 'a constant distinct power level.'"  (A19 at n.19; A615; A616 ¶¶110-111; A2724; A2775; A2778.)

### b.    The intrinsic record supports the district court's construction.

#### (1)    The ordinary meaning supports the district court's construction.

In addition to GBT's admissions, the claim language supports the district court's construction.  The asserted claims require transmitting a preamble "at a first discrete power level" and a second preamble "at a second discrete power level higher than the first discrete power level" or use materially similar terms.  (A141-44 ('267 claims 42-44, 50-52, 58-60); A165-67 ('427 claims 9, 10, 14-22, 24, 26-28).)  The ordinary meaning is clear.  The first preamble is sent "at" one constant power "level" (e.g., power level = 1) and the next preamble is sent "at" a different constant power "level" (e.g., power level = 2).

#### (2)    The specification teaches preambles transmitted at "constant" power levels.

The specification also describes transmitting each preamble at a constant power level.  In the sole disclosed embodiment, each preamble is transmitted at a different power level such as "first power level $P_0$," "second power level $P_1$," and "third power level $P_2$."  (A130, '267 Fig. 6, col. 5:59-6:10.)  The specification explains:  "[P]ower is increased in time *from preamble to preamble* in a *step-wise manner.  The transmitted power during each preamble is constant*."  (A131 col. 7:46-51 (emphasis added).)  Figure 6 and its corresponding text describe the flat, constant power "level" throughout each preamble transmission:

48



FIG 6

(A130-131 (Fig. 6; '267 col. 5:59-6:10; col. 7:47-52.)  As the district court

observed, "the step-wise characteristic is seen from one preamble to another, not

within a single preamble"—the patents "do not describe any other method of

ramping up the power level."  (A20-21.)[17]

---

[17]    GBT conceded at *Markman* below that the Figure 6 embodiment "shows
preambles transmitted at constant power levels."  (A3318.)  At summary judgment,
GBT changed positions, raising a new attorney argument that Figure 6 shows
"'transient' portions at the beginning and end of the preamble where the preamble
power continuously ramps up and ramps down."  (A3384-5.)  The district court
properly rejected GBT's unsupported new argument, which contradicts the
specification, which explains that "[t]he transmitted power during each preamble is
*constant*."  (A131 col. 7:46-51 (emphasis added).)  *Rheox, Inc. v. Entact, Inc.*, 276
F.3d 1319, 1327 (Fed. Cir. 2002) ("Reading the written description alone, this

(3)   **The prosecution histories confirm that each "entire" preamble must be transmitted "completely at" a single power "level," without ramping.**

The prosecution histories likewise confirm this construction of "discrete power level." As the district court stated, "if there is any doubt, the prosecution history also shows that a 'discrete power level' must be at a 'constant' level." (A21.)

GBT's original March 22, 1999 patent application (upstream from all asserted claims) did not include any claim limitations reciting the power level of transmitted preambles. (A936-81.) In a May 6, 2002 Amendment, GBT added application claims 43-49 (different from current claims 43-49), each reciting transmitting a first preamble "at a first power level" and transmitting a second preamble "at a second power level [that is] higher than the first power level" (claims 43, 47-49) or "transmitting a preamble at a set power level" and "increasing power level to a new set power level, and repeating the transmitting step" (claims 44-46). (A1096-98.)

The Examiner rejected claims 43-48 as obvious or anticipated in view of Ozluturk. (A1112-1114.) GBT decided to argue with the PTO, rather than amend

_____

argument might be effective, but in light of the prosecution history, which was generated after the written description was drafted, it is apparent that Rheox relinquished any coverage of TSP.").

50

all of the claims. GBT distinguished its invention from the Ozluturk patent,

explaining that GBT's invention transmits "preambles, each of which is completely

at one of the different levels":

> There are several features of the access methodology disclosed in this case that distinguish over the Ozluturk Patent, which are specified in different ones of the claims (47-49) that are still at issue in this case. For example, as disclosed in this case, each preamble transmission is at a discretely different power level. Application Fig. 6, shows examples of preamble transmissions at discretely different power levels $P_0$ through $P_3$.... By comparison, Ozluturk teaches continuously repeating transmissions and a linear continuous power ramp-up. *Continuous transmission and ramp-up does not provide preambles, each of which is completely at one of the different levels ....*

(A1167-69 (emphasis added).) GBT emphasized that the mobile transmits each

"entire" preamble at one power "level":

> Independent claims 43 and 44 specify transmission of each preamble at one "level." Stated another way, *the entire first preamble transmission is at a one "first power level," and the entire second preamble transmission is at a one "second power level"* (see e.g. claim 43, lines 10-15).... A continuous ramp-up extending through a preamble transmission, as in Ozluturk, would result in a preamble transmission that continues to increase (e.g. in an inclined linear manner) during the respective preamble transmission, *not a complete transmission of a preamble at either "level," as claimed.* Attention is directed to Figs. 5 and 7 of the Ozluturk Patent. *The express claim language therefore excludes continuous power ramp up through one or more preamble transmissions*, e.g. as a continuously increasing signal during each ongoing spreading code transmission, as is apparently the case in the Ozluturk system....

> Dependent claim 45 should be patentable for similar reasons, since the modification proposed in the obviousness (103) rejection over Ozluturk, does not provide either the respective power "level" transmissions or the period "after" a preamble transmission ....

(*Id.* (emphasis added).)  Accordingly, the original prosecution shows that the invention requires the "entire" preamble to be transmitted "completely at" a single power "level," without ramping.

GBT also made clear that "discrete power levels" refer to constant power levels during the prosecution of the '267 reexamination and in prosecuting the '427 patent.  In *Golden Bridge I*, GBT agreed with the "discrete power levels" construction, and did not challenge it on appeal.  (A19 at n.19; A615; A616 ¶¶110-111; A3211; A2775; A2778; A2724.)  During the '267 reexamination and '427 prosecution, GBT made the agreed construction of "discrete power level"— "constant distinct power level"—part of the intrinsic record without protest or comment.  (A1680; A2589; A616 ¶111 (Dr. Kakaes: opining that a person of ordinary skill in the art would accept the definition provided in the intrinsic record).)  Thus, the public record left no doubt—"discrete power levels" refer to constant, distinct power levels.

### c.    The district court correctly rejected GBT's claim construction arguments.

In this case, after initially reiterating its previous agreement to the stipulated construction, GBT retracted its agreement and argued against the construction. None of GBT's arguments justified this about-face.  First, GBT argued that it could have distinguished the Ozluturk references more narrowly during prosecution as teaching only perfectly continuous linear ramping.  Finding that the patentee actually "narrowed the claim limitation to a power level that is at a single or set level, or 'constant,'" the district court correctly rejected GBT's attempt to rewrite the disclaimer based on what it might have argued as legally irrelevant.  (A22-23 (quoting *Norian v. Stryker*, 432 F.3d 1356, 1361-62 (Fed. Cir. 2005) ("[T]here is no principle of patent law that the scope of a surrender of subject matter during prosecution is limited to what is absolutely necessary .... [W]e have not allowed [patentees] to assert that claims should be interpreted as if they had surrendered only what they had to."))).) *See also*, *e.g.*, *Hockerson-Halberstadt*, 222 F.3d at 956 ("[S]tatements made during prosecution commit the inventor to a particular meaning of a claim term that is binding during litigation.").

GBT also argued that it allegedly "retracted" its agreement earlier, in *Golden Bridge I* in its Texas reply brief.  (A3295.)  GBT's argument is incorrect.  As the district court noted, GBT did not change its mind until late in the *present* case, well into the *Markman* process.  (A19 at n19 (noting GBT agreed in *Golden Bridge I*

53

and even in this case with the district court's construction).)  Additionally, GBT's

Texas reply brief did not "retract" GBT's agreed construction; the brief simply did

not address this undisputed issue.[18]  (A3212-20.)

Finally, GBT argued that because some non-asserted claims recite "constant

power levels" rather than "discrete power levels," discrete power levels are not

necessarily constant.[19]  The district court rejected this argument, noting that "[t]his

claim language does not create any issue under the doctrine of claim

differentiation, as it applies to segments of access-burst signals."  (A21 at n.20.)

Moreover, discrete power levels, as GBT stipulated in *Golden Bridge I* and as the

district court held, are power levels that are both constant *and* distinct.  *See Kraft*

*Foods v. Int'l Trading*, 203 F.3d 1362, 1368 (Fed. Cir. 2000) (different claim

wording "does not mandate different interpretations").

---

[18]    Nor did the Texas court rule that "discrete power level" should not be
construed or otherwise reject the agreed construction.  As shown in the Texas
*Markman* order, the term was not disputed for the court to decide.  (*See generally*
A3224-41; A3228 (noting "four remaining disputed terms").)

[19]    GBT cited '427 non-asserted patent claims 8, 13, 31, and 36-38.

2.    **Under the correct construction of "discrete power level,"
summary judgment of non-infringement is required.**

a.    **GBT must prove that the accused products meet the
literal claim language exactly, because it waived any
equivalents theory.**

After Apple moved for summary judgment of non-infringement and noted
that prosecution history estoppel applied (A2851-58; A2863-65), GBT conceded
that it "is not asserting infringement under the doctrine of equivalents of the
'discrete power level' limitation." (A3400; A35 n.6.)

GBT thus waived any equivalents theory and relied solely on literal
infringement. "To establish literal infringement, 'every limitation set forth in a
claim must be found in an accused product, exactly.'" *Becton, Dickinson and Co.
v. Tyco Healthcare Group*, 616 F.3d 1249, 1253 (Fed. Cir. 2010) (citations
omitted). "Any deviation from the claim precludes" a finding of literal
infringement. *Telemac Cellular v. Topp Telecom*, 247 F.3d 1316, 1330 (Fed. Cir.
2001). Thus, to create a genuine issue of fact for trial, GBT needed to present
evidence that each *entire preamble* is transmitted at a constant, distinct power
level. GBT failed to present any such evidence. To the contrary, as set forth
below, GBT's experts admitted that the entire preamble is *not* sent at a constant,
distinct power level.

**b.    GBT presented no evidence that the accused products transmit preambles at constant power levels.**

**(1)    The 3GPP standard specifies varying, non-constant power levels.**

GBT based its infringement allegations largely on the UMTS standard.  But the standard specifies that the preamble is ***not*** transmitted at a constant power level.  To the contrary, the power ramps up for the first 25 microseconds of the preamble and ramps down for the last 25 microseconds, as shown below in 3GPP 25.101 Figure 6.2:



(A836 (red annotations added); A2839.)

GBT did not argue or present any evidence that the accused products operated in any other way. Rather, GBT's infringement experts both admitted that the power "ramps up and then ramps down," potentially "dramatically," within these portions of the PRACH preamble. (A3510 (109:19-23); A3521 (356:9-358:2).)[20] Apple's expert agreed. (A648-50, A656, A685 (¶¶182-186, 200, 251); A3490 (240:3-8 ("the intent of the standard is that the power not be constant over the 4096 chips")); A3492 (261:13-20); A3445.)

Unable to show that the accused devices transmit preambles at constant power levels, GBT argued that *part* of the preamble power is constant. GBT's argument is irrelevant under the correct claim construction and in any event GBT's evidence fell short.

First, GBT submitted test results that addressed only the middle 3,904-chip *portion* of the PRACH preamble.[21] GBT offered no evidence of the power levels

---

[20] Dr. Vojcic's report stated a conclusory opinion that Dr. Boncelet's testing and the UMTS standard showed "constant" power (A227), but he misunderstood that Dr. Boncelet tested only an *average* power for a *portion* of the preamble as noted below, and admitted at deposition that the standard specifies power-ramping, potentially "dramatically," within the preamble. (A3521 (356:9-358:2).) *Dynacore*, 363 F.3d at 1278 ("an expert's unsupported conclusion on the ultimate issue of infringement is insufficient to raise a genuine issue of material fact").

[21] Additionally, GBT's infringement testing expert admitted that to determine the "power within the preamble that's transmitted," only the "combination" of both code and hardware "tells you what actually happens"—and he did not examine either. (A3516 (256:20-257:19, 255:16-19).)

*Confidential Material Redacted*

for the remainder of the 4,096-chip PRACH preamble.  (A3510 (106:16-108:22

("As far as we understand, it's the average over the 3,904 chips")); A3511 (113:9-

23)).  GBT also cited various 3GPP Standard tests, but those tests likewise address

only the middle *portion* of the PRACH preamble.[22]  (A38-39.)

Second, GBT's testing fell short even for the middle portion.  GBT's expert

computed only the *average* power, "so it doesn't tell you what each individual

measurement was from beginning to end."  (A3513 (124:13-15); A3515 (227:6-

228:2) (emphasis added).)  An average provides no evidence of whether or not the

power level was constant during the averaged period.

Third, in an effort to overcome its experts' admissions, GBT noted that Dr.

Vojcic quoted a snippet from an incomplete draft ██████████████████

██████, which discussed, for unknown purposes, ████████████████████

████████████████████████████  (A227-28.)  GBT did not attempt to

submit the ████████████████ as part of the summary judgment

record, and made no attempt to establish any foundation for the assumption in it.

Only admissible evidence may be relied upon to preclude summary judgment.

---

[22]    The district court concluded that the 3,904-chip middle portion is
sufficiently "constant."  (A38-41.)  However, the claim requires the entire
preamble to be constant, not merely a middle portion.  EVM Test 5.13.4 "does not
prove that or even suggest that the RACH preambles will be transmitted at a
constant power level."  (A3491 (257:12-258:22); A3441.)

Fed. R. Civ. P. 56(c)(1)-(2).  Apple also objected to GBT's attempt to "back-door" this inadmissible material through a conclusory mention by Dr. Vojcic.  (A3433-35.)[23]  An unverified assumption in an inadmissible preliminary document cannot raise a material issue of fact, particularly where all experts agree that the power is *not* constant throughout the preamble.

>    **(2)    GBT's argument that ramping up and down is necessary does not raise a material disputed fact.**

GBT also contended that because ramp-up or ramp-down is "necessary," the district court should excuse the missing limitation.  GBT pointed to a statement from Apple's expert, who testified that "you have to have a ramp-up and a ramp-down, but not necessarily as drawn in Figure 6.2.  You could do the ramp-up and the ramp-down different than what's shown in Figure 6.2."  (A40.)

Such testimony does not create an issue of fact or excuse the missing limitation.  Neither Apple's expert nor any other evidence indicated that the

---

[23]    GBT failed to carry its burden for showing admissibility, where the record showed both that an expert would not "reasonably rely" on this inconclusive, unauthenticated preliminary draft excerpt, and any probative value did not substantially outweigh potential prejudice.  (A3433-35; A687-90 (¶¶257-263).)  Fed. R. Evid. 703.  Dr. Vojcic did not rely on the unexplained snippet as facts or data showing the accused devices transmitting constant-power preambles, much less "reasonably" rely; rather, he and Boncelet agreed that the accused preamble power is *not* constant, but ramps up and ramps down.  (A3510 (Boncelet: 109:19-23); A3521 (Vojcic: 356:9-358:2).)

transmitter power must ramp-up and ramp-down *within the preamble transmission*, as GBT misleadingly argued.  Figure 6.2 of the 3GPP Standard—which Apple discussed at summary judgment (A2841-43; A3444)—shows that transmitter power ramp-up begins *before* the start of the PRACH preamble and power ramp-down ends *after* the completion of the PRACH preamble transmission:



Figure 6.2: Transmit ON/OFF template for PRACH preambles

(A836 (colored annotations added); A2843.)

By analogy, a radio volume dial can be turned up to a certain level before the start of a certain radio program, and then turned down after that program ends. GBT's asserted claims require that the power remains at one certain "level"

throughout the "complete" preamble transmission.  The 3GPP Standard likewise could have specified that the power ramps entirely outside of the preamble transmission, but it does not.  GBT's claims exclude preambles that include any power-ramping *within* the preamble transmission.

GBT's arguments thus contradict its statements during prosecution, where it made clear that its claims cover only transmission where the power ramps *outside* of the preamble.  During the preamble transmission in GBT's claimed invention, the power must be "completely at" one power "level" for the "entire ... preamble transmission."  (A1167-68.)  GBT did not say "completely at one power level, except for periods where the power ramps up and down."  GBT emphasized that where its claims recite a power "level," they require a "*complete* transmission of a preamble at either 'level,' *as claimed*."  (A1168 (emphasis added).)  "Claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers."  *Southwall Techs. v. Cardinal IG*, 54 F.3d 1570, 1576 (Fed. Cir. 1995) (citation omitted).

### (3)    "Comprising" does not abrogate the "discrete power level" limitation.

Finally, GBT argued below that because the claims use the word "comprising," they cover preambles that are *not* at constant and distinct power levels.  GBT argued that this Court's "comprising" precedent requires that the claims therefore "cover transmitting preambles having power levels in addition to

the claimed 'discrete power levels,' such as transitional power levels" and "cover

preambles having only one or more than one discrete power level," and that "each

preamble can have 'one or more' power levels."  (A3384-85 (citing cases).)

Although the district court did not need to reach the issue (because it had

already concluded that summary judgment of non-infringement was required), it

mistakenly adopted GBT's view that "comprising" excused the missing claim

limitation.  As a result, the district court did not appreciate that it should have

granted summary judgment on this alternative ground as well.  The district court

stated:

> As construed, a 'discrete power level' requires a power level
> that is constant.  The claim language, which uses the open-
> ended claim language of 'comprising,' does not preclude a
> transient power ramp-up or ramp-down before or after the
> transmitted power level.  *See Free Motion Fitness*, 423 F.3d
> 1343, 1353 (Fed. Cir. 2005).  So long as the claimed preamble
> has one, and only one, discrete power level, it may include
> additional powers, such as a transient power ramp-up and ramp-
> down.

(A39.)

Cases like *Free Motion Fitness*, however, stand for the proposition that "a

party may not *avoid* infringement of a patent claim using an open transitional

phrase, such as comprising, by *adding additional elements*."  *Free Motion Fitness*,

423 F.3d at 1353 (emphasis added).  Here, the accused devices did not "add

additional elements."  Rather, the accused devices *omit* a claim limitation because

the accused devices do not transmit each preamble at the required "discrete power level." As a result, *Free Motion Fitness* does not apply.

"'Comprising' is not a weasel word with which to abrogate claim limitations." *Dippin' Dots v. Mosey*, 476 F.3d 1337, 1343 (Fed. Cir. 2007) (quoting *Spectrum Int'l v. Sterilite*, 164 F.3d 1372, 1380 (Fed. Cir. 1998)); *see also Kustom Signals v. Applied Concepts*, 264 F.3d 1326, 1332 (Fed. Cir. 2001) ("The open-ended transition 'comprising' does not free the claim from its own limitations."). As this Court explained in *Dippin' Dots*:

> 'Comprising' appears at the beginning of the claim — 'comprising the steps of' — and indicates here that an infringing process could practice other steps in addition to the ones mentioned. Those six enumerated steps must, however, all be practiced as recited in the claim for a process to infringe. *The presumption raised by the term 'comprising' does not reach into each of the six steps to render every word and phrase therein open-ended—especially where, as here, the patentee has narrowly defined the claim term it now seeks to have broadened.*

*Dippin' Dots*, 476 F.3d at 1343 (emphasis added).

Here, the presence of "comprising" does not make the "discrete power level" limitation open-ended. The entire preamble transmission must be at one constant power level.

Similarly, GBT argued below that the word "a" in "a discrete power level" would also allow it to abrogate the requirement that the entire preamble be at a single power level. Just as "comprising" does not create an open-ended limitation,

the claim language, specification, and prosecution history preclude interpreting the word "a" to capture a preamble with a non-constant power level.[24]

\* \* \* \* \*

In sum, the "discrete power level" term requires transmitting the entire preamble at a constant power, but the undisputed facts show that UMTS preambles include ramp-up and ramp-down periods within the preamble. Because GBT waived any equivalents theory, neither the word "comprising" nor any of GBT's remaining arguments raise a genuine issue of fact. Accordingly, summary judgment of non-infringement is also required on this alternate ground. *Exigent*, 442 F.3d at 1309; *Ethicon*, 93 F.3d at 1582.

---

[24]    Although the indefinite article "a" usually means "one or more," the general rule does not apply "when the patentee evinces a clear intent to so limit the article." *KCJ v. Kinetic Concepts*, 223 F.3d 1351, 1356 (Fed. Cir. 2000). For example, "[t]he written description supplies additional context for understanding whether the claim language limits the patent scope to a single unitary [element] or extends to encompass a device with multiple [elements]." *Abtox v. Exitron*, 122 F.3d 1019, 1023 (Fed. Cir. 1997) (as amended, 131 F.3d 1009) ("the claim language, as interpreted in light of the specification, limits the microwave devices to a single gas-confining chamber"). Likewise, "an applicant may disclaim before the PTO a plural interpretation and thus lose the benefit of the customary meaning of indefinite articles in patent claims." *KCJ*, 223 F.3d at 1356; *see also Insituform v. Cat Contracting*, 99 F.3d 1098, 1105-07 (Fed. Cir. 1996) ("In light of the language found in the claims, specification and file history, we conclude the only correct and indeed the reasonable interpretation of claim 1 limits the scope of that claim to a process using only one vacuum cup.").

## VI.    CONCLUSION

The claimed "preamble" has not changed since the last time the '267 patent was before this Court.  Then, as now, the preamble is a signal for communicating with the base station that is spread before transmission.  GBT cannot rewrite years of prosecution history and litigation, and until late in this most recent chapter of the *Golden Bridge* litigation, GBT did not attempt to do so.  This Court should reaffirm the meaning of "preamble" and affirm the district court's grant of summary judgment.  In the alternative, the Court should affirm the judgment of non-infringement because the Accused Products indisputably do not transmit preambles at the required "discrete power levels."

Respectfully submitted,

/S/ TIMOTHY S. TETER
TIMOTHY S. TETER
BENJAMIN G. DAMSTEDT
LORI R. MASON
LOWELL D. MEAD
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
(650) 843-5000

*Attorneys for Defendant-Appellee*
*Apple Inc.*

November 14, 2013

# United States Court of Appeals
## for the Federal Circuit

*GOLDEN BRIDGE TECHNOLOGY v APPLE INC.,* 2013-1496

### CERTIFICATE OF SERVICE

I, John C. Kruesi, Jr., being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by COOLEY LLP, Attorney for Appellee to print this document. I am an employee of Counsel Press.

On **November 14, 2013**, Counsel for Appellee has authorized me to electronically file the foregoing **Brief of Defendant-Appellee (Confidential and Non-Confidential versions)** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

Mark D. Giarratana
(Principal Counsel)
Eric E. Grondahl
McCarter & English LLP
CityPlace I, 36th Floor
185 Asylum Street
Hartford, CT 06103
(860) 275-6700
mgiarratana@mccarter.com
egrondahl@mccarter.com

Michael P. Kelly
Daniel M. Silver
McCarter & English LLP
Renaissance Center
405 N. King Street, 8th Floor
Wilmington, DE 19801
(302) 984-6300
mkelly@mccarter.com
dsilver@mccarter.com
tpearson@mccarter.com

Stephen A. Saltzburg
2000 H. Street, N.W.
Washington, D.C. 20052
(202) 994-9811
ssaltz@law.gwu.edu

By agreement between the parties, the confidential version will be served via email on the above counsel on this date.  Additionally, two paper confidential copies will also be mailed to counsel on the same date copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper confidential copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

November 14, 2013                              /s/John C. Kruesi, Jr._____
                                               Counsel Press

67

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).

1.     Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B), the brief contains 13,828 words.

2.     The brief has been prepared in proportionally spaced typeface using Microsoft Word 2003 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(a)(7)(B), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

November 14, 2013                      /S/ TIMOTHY S. TETER
                                       TIMOTHY S. TETER
                                       COOLEY LLP
                                       *Attorneys for Defendant-Appellee*
                                       *Apple Inc.*